In re Francis P. TRACEY, Debtor.

Henry C. ELLIS, Trustee-in-Bankruptcy of Francis P. Tracey, Plaintiff,

v.

Francis P. TRACEY, Helen Feeney and Maureen E. McKinnon, Defendants.

Bankruptcy No. 86–11439–JNG.
Adv. P. No. 87–1240.

United States Bankruptcy Court,
D. Massachusetts.

July 27, 1988.

Michael Arthur Walsh, Choate, Hall & Stewart, Boston, Mass., for plaintiff.

Joseph P. Foley, Boston, Mass., for defendants.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

The Trustee filed the above captioned complaint against the Debtor Francis P. Tracey ("Tracey" or the "Debtor"), Helen Feeney ("Feeney") and Maureen E. McKinnon ("McKinnon"), the Debtor's niece, on September 18, 1987. Through his complaint, the Trustee seeks to set aside certain conveyances made by the Debtor to Feeney and McKinnon of interests in Unit E–21, a condominium located at 36 Belmont Road, West Harwich, Massachusetts, in which Tracey now resides. The defendants answered the complaint, and, after a period for discovery, the matter was tried on February 4, 1988. However, to a large extent, the matter was presented to the Court through stipulations and admissions. The Trustee and Tracey submitted post-trial briefs on May 12, 1988. The Court makes the following findings of facts and conclusions of law.

## FACTS

The Debtor purchased the West Harwich condominium from the Highlands Realty Trust for $62,000 on August 19, 1977. The fair market value of the condominium has appreciated ever since. It now is worth approximately $140,000.

On or about January 28, 1981, Tracey was indicted by the United States upon charges that he knowingly and willfully attempted to evade and defeat a part of income tax due and owing to the United States and upon charges of knowingly and willfully making and subscribing to false income tax returns in violation of the Internal Revenue Code. The gravamen of the charges against Tracey was that he abused his official duties as an employee of the City of Boston. Tracey, who was a Deputy Commissioner in the City's Real Property Department, apparently extorted money from various individuals and then failed to disclose the payments on his federal and state income tax returns for the years in which he received them.

Prior to his indictment, in the spring of 1978, Tracey retained James J. Sullivan ("Sullivan") and the law firm of DiMento and Sullivan. Sullivan and Tracey had known each other prior to 1978. Sullivan had been the Real Property Commissioner for the City of Boston, and he and Tracey, along with several others, had been involved in a business venture. At the time Tracey retained Sullivan, he was under investigation by the Suffolk County grand jury.

Both Sullivan and Tracey testified about the fee arrangement they discussed at their initial meetings. Sullivan, on the one hand, indicated that no specific figures were men-

tioned. He testified that Tracey merely instructed him to do what was necessary to defend him and that Tracey promised to pay him a reasonable fee for his services. Tracey, on the other hand, testified that his understanding was that $35,000 would cover his representation in connection with the criminal investigation and any trial.

DiMento and Sullivan sent Tracey a bill for services on or about October 11, 1978. The bill, which Tracey admitted receiving, was in the amount of $8,500. DiMento and Sullivan sent Tracey a second bill for services on or about June 6, 1979. The second bill was in the amount of $3,000 and indicated that $11,500 was then outstanding. Tracey received the second bill in the ordinary course.

Approximately two and one half months after his indictment by the United States, trial in the case of *United States v. Francis P. Tracey* commenced. DiMento and Sullivan continued to represent Tracey. Prior to the commencement of the trial, Tracey had been advised by DiMento and Sullivan that, if he was acquitted of the charges brought against him, he might have a claim against the City of Boston for the costs he incurred in connection with his defense, including his attorneys' fees.

On May 1, 1981, the jury convicted Tracey upon all counts in the indictment. The amount of taxes Tracey was convicted of attempting to evading was $15,948.75: $4,717.25 for 1975, $8,343.60 for 1976 and $2,887.90 for 1977. Upon his conviction and subject only to disposition upon appeal, Tracey became liable to the government for $15,948.78, plus penalties in the amount of $11,961.58, plus interest. Upon his conviction, Tracey also became liable to the Commonwealth of Massachusetts, subject only to disposition upon appeal, in the total amount of $2,319.41 in taxes for the years 1975, 1976 and 1977, plus penalties in the total amount of $1,671.82, plus interest.

Shortly after his conviction, on May 7, 1981, DiMento and Sullivan sent Tracey a third bill for services in the amount of $20,000 and for disbursements in the amount of $4,163.14, bringing Tracey's total obligation to the firm to $35,663.14.

On May 18, 1981, Tracey was sentenced by the United States District Court for the District of Massachusetts to serve 18 months in prison and to pay a criminal fine of $15,000.

Between the time of his conviction and sentencing, Tracey on May 15, 1981, conveyed Unit E-21 to himself and Feeney, a long-time friend, as joint tenants, for consideration of less than $100. At the time, Tracey's obligations to the United States, the Commonwealth of Massachusetts and DiMento and Sullivan exceeded $67,500. Moreover, Tracey was no longer employed by the City of Boston. His income, derived from investments, a disability pension and Veterans Administration benefits, totalled $2,362.56 per month.

Tracey decided to appeal his conviction. Sullivan and DiMento represented him in connection with his appeal. On April 15, 1982, the United States Court of Appeals for the First Circuit affirmed Tracey's conviction. Prior to that ruling, DiMento and Sullivan, on or about March 4, 1982, sent him a fourth bill for services in the amount of $40,000, plus $549.15 for disbursements, bringing Tracey's total obligation to the firm to $76,212.29.

On or about May 25, 1982, Tracey conveyed his remaining interest in Unit E-21 to himself, Feeney and McKinnon, then known as Maureen E. Tracey, as joint tenants, for consideration of less than $100. At the time, Tracey had not paid the $15,-000 fine imposed upon him at the time of his conviction or his outstanding tax obligations to the IRS and the Commonwealth of Massachusetts, which tax obligations alone exceed $36,750 by May 1982. Tracey's total obligations to the United States, the Commonwealth of Massachusetts and DiMento and Sullivan exceeded $127,000 as of May 25, 1982.

DiMento and Sullivan continued to represent Tracey. On or about July 1, 1983, the firm sent Tracey a fifth bill in the amount of $32,250 plus disbursements in the amount of $242.94, bringing his total obligation to the firm to $108,705.23.

Tracey did not pay any of the bills sent to him by DiMento and Sullivan. Accordingly, on or about January 4, 1985, the firm commenced suit against him in Suffolk County Superior Court to recover $100,446.61, which was the amount it claimed was due for legal services at the time. In conjunction with the suit, the firm sought a writ of attachment. The writ was issued by the Suffolk Superior Court on January 8, 1985. Pursuant to the writ of attachment, Tracey's accounts with the Cape Cod Five Cent Savings Bank were frozen.

Less than one month after the writ of attachment was issued, on February 4, 1985, Tracey and McKinnon conveyed their interests in Unit E–21 to Feeney for $20,000. At the time of the conveyance, Tracey still had not paid his fine or his tax obligations to the United States and the Commonwealth of Massachusetts, and he remained indebted to DiMento and Sullivan. Additionally, he owed the Bradford Trust Company $5,569.10 and the Cape Cod Five Cent Savings Bank $18,000 pursuant to a note secured by a mortgage on Unit E–21. Moreover, his monthly income had declined to $1,962.56.

## DISCUSSION

The Trustee seeks to set aside three separate conveyances of the Debtor's interest in the condominium in West Harwich. To summarize, the first conveyance occurred on May 15, 1981 when Tracey conveyed his interest in Unit E–21 to himself and Feeney; the second conveyance occurred on May 25, 1982 when Tracey conveyed Unit E–21 to himself, Feeney and McKinnon; and the third conveyance occurred on February 4, 1985 when the Debtor and McKinnon conveyed their interests in Unit E–21 to Feeney, thereby making her the sole owner of the condominium.

1. Mass.Gen.Laws Ann. ch. 109A is applicable to the instant proceeding by reason of 11 U.S.C. § 544(b) of the Bankruptcy Code. Section 544(b) gives the Trustee the right to avoid conveyances of property "voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title...." 11 U.S.C. § 544(b) (West 1988).

The Trustee argues that all three conveyances should be set aside pursuant to sections 6 and 7 of the Massachusetts Uniform Fraudulent Conveyance Act, Mass.Gen. Laws Ann. ch. 109A, §§ 6, 7 (West 1958)[1] (the "Act"). Section 6 provides:

> Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature is fraudulent as to both present and future creditors.

Mass.Gen.Laws Ann. ch. 109A § 6 (West 1958). The Act defines fair consideration in relevant part as follows:

> Fair consideration is given for property or obligation—
> (a) When in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied....

Mass.Gen.Laws Ann. ch. 109A, § 3(a) (West 1958). The Trustee contends that whatever consideration was given in connection with the conveyances in question did not constitute a fair equivalent for the interests conveyed. With respect to the first two conveyances, Unit E–21 was worth in excess of $62,000 and the consideration received for the interests conveyed was less than $100. At the time of the third conveyance, the fair market value of Unit E–21 was in excess of $100,000. Thus, according to the Trustee, Feeney's $20,000 payment for interests worth in excess of $33,000 was not a fair equivalent, even accepting Tracey's premise that Feeney, as a result of the 1981 and 1982 conveyances, already owned 66.6% of Unit E–21.[2]

The definition of fair consideration involves the concept of good faith. The

2. As a result of the 1981 conveyance Feeney and Tracey each owned 50% of Unit E–21. As a result of the 1982 conveyance, Tracey and McKinnon each held a one-sixth interest and Feeney owned two-thirds of the condominium.

Trustee points out that lack of good faith can be inferred from 1) lack of fair consideration; 2) lack of an arms-length relationship between the Debtor and both Feeney and McKinnon; and 3) the effect of the conveyances upon the parties. With respect to the Trustee's third point, after each of the conveyances, the Debtor continued to live in Unit E–21. He did not enter into a lease with Feeney and/or McKinnon, and he did not pay them any rent. Moreover, Tracey continued to receive real estate tax assessments in his own name, and he continued to pay all the bills and condominium association fees in connection with the property.

Section 6 contains two aspects: lack of fair consideration and an intent or belief regarding the incurrence of debt on the part of the conveyancer. With respect to the second aspect of section 6 of the Act, namely whether the Debtor intended or believed that he would incur debts beyond his ability to pay, the Trustee notes that intent is ordinarily proved by circumstances surrounding the transaction. In the Trustee's view, the circumstances surrounding each conveyance compel the conclusion that the Debtor intended or believed he would incur debts beyond his ability to pay. The first conveyance occurred two weeks after the Debtor's conviction on income tax evasion, a conviction that triggered liabilities to the IRS and the Commonwealth for back taxes, interest and penalties in excess of $30,000. Moreover, according to the Trustee, Tracey had to be aware that a fine would likely be imposed by the sentencing judge. Additionally, Tracey had been presented with a bill for legal services in the amount of $35,663.14 shortly before the first conveyance.

Tracey had retired from the City of Boston in 1978 so that at the time of the first conveyance, his monthly income was derived solely from investments, a disability pension, and Veterans Administration benefits. According to Tracey's testimony at the trial, his income totalled $2,362.56 per month. Tracey's monthly income had not increased at the time of the second conveyance which occurred five weeks after the United States Court of Appeals for the

First Circuit affirmed his conviction thereby eliminating any contingencies with respect to his tax liabilities. At the time of the third conveyance Tracey's income had declined to $1,962.56, yet his liabilities had more than doubled.

As a result of these circumstances and in the absence of fair consideration, the Trustee argues that all three conveyances were fraudulent and should be set aside pursuant to Mass.Gen.Laws Ann. ch. 109A, § 6. However, the Trustee also relies upon section 7 of the Act which provides in relevant part:

> Every conveyance made …with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Mass.Gen.Laws Ann. ch. 109A, § 7 (West 1958). He maintains that all the facts and circumstances highlighted with respect to section 6 of the Act support a finding under section 7 as well.

Finally, the Trustee argues that the third conveyance should be set aside pursuant to section 4 of the Act, which provides in pertinent part that:

> Every conveyance made …by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Mass.Gen.Laws Ann. ch. 109A, § 4 (West 1958).

Section 2 of the Act provides that:

> [a] person is insolvent within the meaning of this chapter when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts when they become absolute and matured.

Mass.Gen.Laws Ann. ch. 109A, § 2 (West 1958).

Through admissions and stipulations, the total amount of the Debtor's liabilities as of the date of the third conveyance was in excess of $184,069.10 broken down as follows:

| | |
|---|---|
| Liability to the I.R.S. | in excess of $ 40,000.00 |
| Liability to the United States upon fine | $ 15,000.00 |
| Liability to the Commonwealth of Massachusetts | in excess of $ 5,500.00 |
| Liability to Cape Cod Five Cent Savings Bank | in excess of $ 18,000.00 |
| Liability to Bradford Trust Co. | $ 5,569.10 |
| Liability to DiMento & Sullivan | in excess of $100,000.00 |

The Debtor's assets, at the time of the February 4, 1985 conveyance included:

| | | |
|---|---|---|
| Bank accounts | | $36,000.00 |
| Personal property | less than | $25,000.00 |
| Cash on hand | less than | $10,000.00 |
| Value of insurance | | $ 4,000.00 |
| Florida real estate | less than | $15,000.00 |

The Debtor also owned a fractional interest in the Namelock Realty Trust. The Trustee presented evidence that was unrebutted supporting the conclusion that the value of the Debtor's interest in the trust was far less than $94,069.10, the difference between the total amount of the Debtor's liabilities and the total fair salable value of his assets (i.e., $184,069.10–$90,000). Thus, the inclusion of the Debtor's interest in the trust among the Debtor's other assets does not alter the fact that at the time of the February 4, 1985 conveyance the Debtor was insolvent.

In his post-trial memorandum, the Debtor failed to challenge in any way the Trustee's position with respect to the February 4, 1985 conveyance. Accordingly, the Court finds that the February 4, 1985 conveyance was fraudulent. The Court hereby sets the 1985 conveyance aside pursuant to section 4 of the Massachusetts Uniform Fraudulent Conveyance Act, thereby obviating the need to decide whether that conveyance could be set aside pursuant to either section 6 or section 7 of the Act.

■ Tracey does challenge the Trustee's position with respect to the 1981 and 1982 conveyances, however. He argues that the Trustee failed to establish, particularly with respect to the May 15, 1981 conveyance, that he intended or believed that his debts would exceed his ability to pay or that he actually intended to defraud DiMento and Sullivan. Tracey stresses that, as a lay person, he had no way of anticipating the magnitude of his legal fees. Moreover, he suggests that given his circumstances, the May 15, 1981 conveyance of a one half interest in his home to Feeney, a woman to whom he had proposed marriage, was not unreasonable.

At the trial, Tracey testified that, as of May 15, 1981, he owned, excluding Unit E–21, the following assets: 1) 50 units of Massachusetts tax exempt trust bonds that he purchased for $51,062.50 in July 1978; 2) 20 units of Massachusetts tax exempt trust bonds that he purchased for $20,677.40 in September 1978; 3) two parcels of land in Florida, one bought in 1968 for $1,995 and the other bought in 1975 for $5,155; and 4) a 1979 Cadillac which he valued at $15,000 as of May 15, 1981. Tracey also testified that he owned life insurance and had money in the bank. Although the Court finds that the testimony is far from convincing as evidence of the actual value of Tracey's assets in May of 1981, the Debtor's testimony must be accorded some weight. Thus, the Court observes that his testimony lends credence to Tracey's position that he did not intend or believe that he would incur debts beyond his ability to pay at the time of the May 1981 conveyance.

On May 15, 1981, Tracey's liabilities did not exceed approximately $102,500. He owed DiMento and Sullivan and the taxing authorities approximately $67,500. He owed approximately $20,000 on his condominium mortgage, and he could reasonably expect to be fined as a result of his conviction. However, Tracey's conviction was subject to reversal on appeal, his income of approximately $28,000 per year was not inconsequential and he had valuable assets that from the evidence presented more likely than not equalled his liabilities. Accordingly, the Court finds that the Trustee failed to carry his burden of proof with respect to the second prong of section 6 of the Act, and section 7 of the Act. Consequently, the May 15, 1981 conveyance cannot be set aside as fraudulent.

■ With respect to the 1982 conveyance, the Court finds that the Trustee carried his burden of proof. Clearly, Tracey's obligations at the time, i.e., approximately $127,000, not counting his mortgage obligation, equalled and, more likely from the minimal evidence submitted by the Debtor,

exceeded his assets. Additionally, at the time of this conveyance, any hope Tracey may have had that his conviction would be overturned had been shattered by the First Circuit Court of Appeals' April 15, 1982 ruling. Therefore, the Court has no trouble concluding from the circumstances surrounding this conveyance, that Tracey intended or believed that he would be incurring debts beyond his ability to pay.

In view of the foregoing, the memoranda and arguments of counsel, the Court hereby enters judgment for the Trustee and against Tracey with respect to the May 25, 1982 and February 4, 1985 conveyances and for Tracey and against the Trustee with respect to the May 15, 1981 conveyance. Accordingly, a one-half interest in the West Harwich condominium is property of the bankruptcy estate, and the Trustee may proceed to take what ever action he deems appropriate with respect to that interest.

So ordered.